**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE:<br><br>CONFIRMATRIX LABORATORY, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 16-69934-PWB |

**MOTION FOR AN ORDER (I) AUTHORIZING THE DEBTOR TO EXECUTE AGREEMENT TO RETAIN NYX HEALTH RECOVERY SERVICES, LLC TO PURSUE COLLECTION OF CERTAIN ACCOUNTS RECEIVABLE OWED TO THE DEBTOR; (II) AUTHORIZING THE DEBTOR TO PAY NYX HEALTH RECOVERY SERVICES, LLC THE FEE PURSUANT TO THE AGREEMENT; (III) WAIVING THE 14-DAY STAY UNDER BANKRUPTCY RULE 6004(h); AND (IV) GRANTING OTHER RELATED RELIEF**

Pursuant to Sections 105 and 363(b)(1) of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Confirmatrix Laboratory, Inc., a debtor and debtor-in-possession in the above-styled chapter 11 case (the "Debtor"), through its undersigned counsel, hereby seeks authority to (i) enter in and execute, outside the ordinary course of business, an agreement with NYX Health Recovery Services, LLC ("NYX") to pursue collection of certain accounts receivable owed to the Debtor, (ii) pay to NYX the fee associated with such services, and (iii) waive the 14-day stay under Bankruptcy Rule 6004(h). In support thereof, the Debtor shows as follows:

## Jurisdiction and Venue

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this case is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The Court has the authority to grant the requested relief pursuant to Sections 105 and 363 of the Bankruptcy Code.

## Facts

1. On November 4, 2016 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition"). In accordance with §§ 1107 and 1108 of the Bankruptcy Code, the Debtor continues to operate its business as a debtor-in-possession. No trustee, examiner or official committee of unsecured creditors has been appointed in this case.

2. The Debtor's principal place of business is located at 1770 Cedars Road, Suite 200, Lawrenceville, Gwinnett County, Georgia 30045. The Debtor is a laboratory business providing two main types of laboratory testing services: toxicology and blood testing. Currently, as a result of recent Medicare changes, the Debtor is undergoing restructuring of its business to reduce its toxicology testing side and increase its blood testing side.

3. As part of its restructuring the Debtor has performed a review of its accounts receivable ("Accounts") and identified a subset which remains significantly past due. As of the Petition Date, the Debtor's Accounts that have aged at least 120 days (the "Past Due Accounts") totaled approximately $31,502,908.43. In the past, the Debtor's collection rate of such Past Due Accounts has been negligible and has failed to generate any significant income for the Debtor.

The Debtor believes that a meaningful amount of the Past Due Accounts could be collected if the Debtor retains a collection company which has experience in pursuing collections of this particular type of accounts which are subject to specialized regulations. The retention of a collections company to pursue collection of the Past Due Accounts will benefit not only the Debtor but its estate and creditors as it is expected to generate meaningful revenue from Accounts which in all likelihood will otherwise never be collected.

4. After soliciting and reviewing offers from other collection companies, the Debtor has selected NYX[1] as a suitable partner for purposes of pursuing collections of Debtor's Past Due Accounts for various reasons, some of which are: (i) NYX specializes in the collection of laboratory accounts receivable which is a very specialized area of collections; (ii) NYX's office located at 8440 Holcomb Bridge Road, Suite 560, Alpharetta, Georgia is within close physical proximity to Debtor's office which should provide for a smoother collection of Debtor's data as well as lower cost; and (iii) NYX has the capability to begin work on the collections of the Past Due Accounts immediately upon obtaining Court approval to retain NYX.

5. Through its negotiations with NYX, the Debtor was able to secure better terms than what was originally proposed by NYX. The final agreement with NYX (the "Agreement") was negotiated in good faith and at arms-length. A true and accurate copy of the Agreement is attached hereto as Exhibit "A." As a point of information, to avoid any delay in the retention of NYX, the Debtor filed this Motion less than twenty-four (24) hours after the parties finalized the terms of the Agreement.

[1] NYX is not a professional subject to the provisions and requirements of 11 U.S.C. §§ 327 and 328.

6. A brief summary of the key elements of the Agreement is as follows:

a. NYX has agreed to perform the services under the Agreement in exchange for receiving a twenty percent (20%) fee (the "Fee") from the gross amount of payments received by the Debtor on account of NYX's services. The fee is solely paid from the actual collections and generates no out-of-pocket expense to the Debtor;

b. The Fee is very reasonable considering the level of risk and expense undertaken by NYX in connection with the services it will provide under the Agreement and the higher amounts sought by some competitors;

c. In the unexpected and unlikely event that the relationship between the Debtor and NYX proves to be burdensome to the Debtor and/or its estate or otherwise does not produce the level of benefits anticipated, the Agreement is terminable at will upon a 30-day written notice.

**<u>Relief Requested</u>**

7. Under Section 363(b)(1) of the Bankruptcy Code, the Debtor may only use property of the estate other than in the ordinary course of its business with the Court's approval after notice and a hearing. While the Debtor believes that the entry in the Agreement and the payment of the Fee to NYX is in the ordinary course of Debtor's business, out of abundance of caution, Debtor seeks authority to enter in and execute the Agreement and pay to NYX the Fee as it comes due.

8. Authorizing the Debtor to use property of the estate to enter in the Agreement and pay NYX the Fee is in the best interest of the Debtor and its estate as it will generate income from accounts receivable exceeding $30 million which are otherwise uncollectable. Even a small percentage recovery on such a large outstanding amount will generate meaningful proceeds to the Debtor. In the meantime, the risk to the Debtor associated with the Agreement is nominal, if not non-existent, as the Agreement does not require the Debtor to expend any funds until actual recovery on the Past Due Accounts is made and the Debtor has the right to terminate the Agreement on a 30-day written notice. The prospective income the Past Due Accounts could generate will significantly enhance Debtor's efforts to successfully reorganize.

9. By this motion, Debtor also seeks a waiver of the 14-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

10. The Debtor believes that waiving the 14-day stay is necessary in this case in light of the relatively low-risk to the Debtor and its creditors arising out of its entry in the Agreement as opposed to the substantial benefit the relief sought herein will provide. The faster the Debtor is authorized to enter in the Agreement and retain NYX, the faster NYX can begin to pursue collection of the Past Due Accounts and realize recovery on same. As such, any delay in the grant of the relief requested herein will actually serve to prejudice not only the Debtor but also its creditors as it will delay the recovery of otherwise uncollectable accounts receivable. For the

reasons stated herein, Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

WHEREFORE, the Debtor requests that this Court enter an Order (i) granting this Motion and authorizing the Debtor to execute the Agreement and pay NYX the Fee as it comes due, (ii) waiving the 14-day stay imposed by Bankruptcy Rule 6004(h), and (iii) granting such other and further relief as may be just and proper.

Respectfully submitted this 2nd day of December, 2016.

/s/ J. William Boone
J. William Boone
Georgia Bar No. 067856
Doroteya N. Wozniak
Georgia Bar No. 627491
3399 Peachtree Road, N.E., Suite 1700
Atlanta, Georgia 30326
(404) 997-6020
(404) 997-6021 (fax)
bboone@jamesbatesllp.com
dwozniak@jamesbatesllp.com

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**

**ATLANTA DIVISION**

| | |
|---|---|
| IN RE: | Chapter 11 |
| CONFIRMATRIX LABORATORY, INC., | Case No.:16-69934 |
| Debtor. | |

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, I served true and correct copies of the foregoing pleading by filing same with the CM/ECF electronic-filing system and depositing same in the United States mail, with adequate first class postage affixed thereon, properly addressed to the parties on the service list as follows:

See Attached Service List

This 2nd day of December, 2016.

/s/ J. William Boone
J. William Boone
Georgia Bar No. 067856
Doroteya N. Wozniak
Georgia Bar No. 627491
3399 Peachtree Road, N.E.
Suite 1700
Atlanta, Georgia 30326
(404) 997-6020
(404) 997-6021 (fax)
bboone@jamesbatesllp.com
dwozniak@jamesbatesllp.com
*Counsel for Confirmatrix Laboratory, Inc.*

Service List

360 Medical Supplies, Inc.
815 Progress Court, Suite A
Lawrenceville, GA 30043

American Express
P.O. Box 360001
Fort Lauderdale, FL 33336-0001

Adam Hough
c/o Compliance S.O.S.
Deborah Tanenbaum McCormick
2001 Big Sky Lane
Franklin, TN 37067

FedEx
P.O. Box 660481
Dallas, TX 75266-0481

Garner Group, LLC
1206 State Blvd.
Franklin, TN 37064

James H. Morawetz
Office of the United States Trustee
Suite 362, Russell Federal Building
75 Ted Turner Drive
Atlanta, GA 30303

Gwinnett Co. Tax Commissioner
P.O. Box 372
Lawrenceville, GA 30046

Siemens Healthcare Diagnostics
P.O. Box 121102
Dallas, TX 75312-1102

Newegg, Inc.
Attn: Accts Receivable
17560 Rowland St
Rowland Heights, CA 91748

Phenomenex
P.O. Box 749397
Los Angeles, CA 90074

Bio Rad
P.O. Box 849740
Los Angeles, CA 90084-9740

AT&T
P.O. Box 105262
Atlanta, GA 30348-5262

Blue Cross Blue Shield of GA
PO Box 5281
Carol Stream, IL 60197-5281

Nue Medical Consulting Inc.
GNOS Medical,
Suite 1800
1130 Hurricane Shoals Rd, NE
Lawrenceville, GA 30043

Quest Diagnostics
P.O. Box 740736
Atlanta, GA 30374-0736

Sun Life Financial
P.O. Box 7247-0381
Philadelphia, PA 19170-0381

SunTrust Bank
c/o Morris, Manning & Martin, LLP
Attn: Frank DeBorde, Esq.
3343 Peachtree Rd NE
Suite 1600, Atlanta Financial Center
Atlanta, GA 30326

Sun Trust Equipment Finance
& Leasing Corp.
Morris, Manning & Martin, LLP
Attn: Frank DeBorde, Esq.
3343 Peachtree Rd NE
Suite 1600, Atlanta Financial Center
Atlanta, GA 30326

The Hartford
P.O. Box 660916
Dallas, TX 75266-0916

TransProma Inc.
Suite 300
3145 Northwoods Pkwy.
Norcross, GA 30071

UCT, LLC
2731 Bartram Road Bristol
Bristol, PA 19007

UPS
P.O. Box 7247-0244
Philadelphia, PA 19170-0001

United Parcel Service, Inc.
Attn: Lawrence M. Schwab, Esq.
Kenneth T. Law, Esq.
Bialson, Bergen & Schwab
A Professional Corporation
633 Menlo Avenue, Suite 100
Menlo Park, CA 94025

UPS Mail Innovations
Attn: Kenneth T. Law, Esq.
Bialson, Bergen & Schwab
A Professional Corporation
633 Menlo Avenue, Suite 100
Menlo Park, CA 94025

UPS Brokerage
Attn: Kenneth T. Law, Esq.
Bialson, Bergen & Schwab
A Professional Corporation
633 Menlo Avenue, Suite 100
Menlo Park, CA 94025

United Ground Freight, Inc.
Attn: Kenneth T. Law, Esq.
Bialson, Bergen & Schwab
A Professional Corporation
633 Menlo Avenue, Suite 100
Menlo Park, CA 94025

UPS Supply Chain Solutions, Inc.
Attn: Kenneth T. Law, Esq.
Bialson, Bergen & Schwab
A Professional Corporation
633 Menlo Avenue, Suite 100
Menlo Park, CA 94025

American Express
c/o Becket & Lee, LLP
Attn: Kenneth W. Kleppinger
16 General Warren Boulevard
Malvern, PA 19355

Wondfo USA Co. Ltd
545 Willowbrook Center Pkwy
Unit B
Willowbrook, IL 60527

Georgia Power Company
c/o McGuire Woods, LLP
Attn: Thomas R. Walker, Esq.,
Karyn D. Heavenrich, Esq.
Suite 2100, Promenade
1230 Peachtree Street, N.E.,
Atlanta, GA 30309-3534

# NYX HEALTH RECOVERY SERVICES, LLC

## ACCOUNTS RECEIVABLE RECOVERY AGREEMENT

**THIS ACCOUNTS RECEIVABLE RECOVERY AGREEMENT** (this "Agreement") is entered into as of the 1st day of December, 2016 by and between **NYX HEALTH RECOVERY SERVICES, LLC,** a Georgia limited liability company ("Company") and **CONFIRMATRIX LABORATORY, INC.**, a Georgia limited liability company ("Client") (Company and Client also referred to, collectively, as the "parties" and, individually, as a "party").

## RECITALS:

WHEREAS, Company is in the business of providing a variety of services to and on behalf of physicians, medical practices and other health care providers, including collections of aging accounts receivable for claims payable by insurance companies and other third party payors; and

WHEREAS, Client is a clinical laboratory that provides or arranges for the provision of clinical laboratory services to healthcare providers and patients; and

WHEREAS, Client desires to contract with Company to render accounts receivable recovery services for aged accounts receivable as those particular services to and on behalf of Client are more fully described in this Agreement (the "Services"), and Company desires to render said Services, upon the terms and conditions hereinafter set forth; and

WHEREAS, Client has filed a petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court"), Case No. 16-69934-PWB (the " Bankruptcy Case"); and

WHEREAS, Client and Company acknowledge and agree that this Agreement and the transactions contemplated herein must be approved by entry of an order of the Bankruptcy Court (the "Approval Order").

NOW, THEREFORE, in consideration of the mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, the parties agree as follows:

1. **Recitals.** The above recitals are true and correct and incorporated herein. Each of the parties agrees and acknowledges that each respective party is fully bound by the statements contained in the recitals.

2. **Commencement and Term.**

(a) Commencement. Commencing on the date of the Approval Order (the "Commencement Date"), Client hereby retains Company, and Company hereby agrees to be retained, for the purpose of providing the Services for and on behalf of the Client. Company shall be the Client's exclusive provider of the Services during the Term.



EXHIBIT
A
Blumberg No. 5118

(b) Term. The term of this Agreement shall begin on the Commencement Date and continue for a period of one (1) year after the Commencement Date ("Initial Term"), subject to any termination pursuant to Section 5, below.

3. **Responsibilities of the Company**.

(a) Services. Company shall seek to collect Client's accounts receivable that has aged at least one hundred twenty (120) days, but does not exceed two (2) years ("Aged A/R"). Aged A/R shall include claims with Medicare, Tricare, insurance companies or other third party payors that have stopped being pursued by routine billing and collections processes and systems of Client and are present on Client's aging accounts receivable for unpaid invoices that are at least one hundred twenty (120) days aged but not more than two (2) years aged. To collect the Aged A/R, Company will bill for all services rendered by and in the name of Client under Client's federal tax identification number, and either Company or Client shall deposit any amounts collected due to Company's efforts on behalf of Client in a bank account in a federally insured bank or branch thereof designated by, in the name of, and under the control of Client ("Account"). Company shall not bill patients directly or seek payment from patients without the consent of Client. The Services with respect to the Aged A/R may include claims transmission, payment posting, follow-up on unpaid claims, denial management resolution and monthly financial reporting.

(b) Policies and Procedures. Company will seek to collect payment for clinical laboratory services in accordance with Client's policies and procedures.

(c) Compliance. Notwithstanding the above, nothing herein shall require Company to collect aging accounts receivable under any managed care contract, insurance contract, Medicare or Medicaid program or to any other third party payor that Company reasonably believes is in violation of any of the rules and regulations of any of such contracts or programs. Upon identifying such reasonable belief, Company shall notify Client immediately.

4. **Responsibilities of Client**.

(a) Initial Claim Submission. Client shall perform all of its own coding (regardless of the location or the type of services provided). Company will rely exclusively on the billing, coding, and other information provided to Company by Client and its health care providers, using such systems, hardware, software as are provided by the Company and in accordance with such policies and procedures reasonably required by Company. Company will not have any liability to Client or any other person for any error in collections that is caused by or is the result of the billing, coding, or other information provided by Client or Client's health care providers.

(b) Policies and Procedures. Company will adopt the Client's billing and collection policies and procedures on or before the Commencement Date to the extent deemed necessary by Company.

(c) Training. Client agrees to train its employees, independent contractors and agents in the applicable rules and regulations governing coverage and billing for any third party payor with which it contracts or to which it provides patient services. Upon reasonable request, Company will cooperate with Client in training Client's employees, independent contractors and agents with respect to all aspects related to the Services.

(d) Deposits. Client will, and will require its management and staff, to deposit any and all amounts collected, either through the efforts of Company or otherwise, into the Account.

(e) Excluded Persons. Client shall validate at the time of hire and at least annually thereafter that no person who renders services for Client that are billed by Company was or is excluded from participation in the Medicare or Medicaid programs and that Client is duly licensed or otherwise legally authorized and in good standing to render those services billed or to be billed by the Company.

(f) Access. Client will make available to Company access to such medical records, charts, histories and any other pertinent information in Client's possession as Company may require to perform Services, so long as Company acknowledges the confidential nature of the records and agrees to protect the confidentiality of the records as required by law. Client will provide any and all log-in user identifications and passwords necessary to provide Company adequate access to perform the Services.

(g) Evidence of Collections. At regular intervals of every two weeks, or upon Company's written request, Client will provide Company evidence (e.g., copies of deposit slips or deposited checks) of Aged A/R Collections received by Client.

(h) Notice. Client will timely notify Company's chief executive officer of any error, omission, action or failure to act related to and/or involving Client or any of its employees or agents that may materially adversely affect Company's provision of the Services.

(i) [Omitted].

(j) Hardware and Software. If Client is utilizing cloud-based technology, Client will be responsible for providing to Company with connectivity and access to such information to enable the Company to provide the Services, and shall be responsible for all associated fees. To the extent Client is not utilizing cloud based technology, Client will be responsible for providing all hardware and software and connectivity, including, without limitation, all required updates to software and necessary licenses, connectivity charges and all ongoing maintenance, repair and replacement to both hardware and software deemed necessary and appropriate by Company to enable the Company to provide the Services. Client shall provide Company all login information and passwords necessary to provide the services. In addition, Client will provide IT support to Company as reasonably required by Company. Client expressly acknowledges that Company is not responsible for its inability to provide Services due to any hardware or software downtime or due to lack of connectivity or for the resolution of any disputes between Client and its hardware and/or software providers (including cloud-based providers) even if Company introduced Client to such provider. Client's relationship with any such hardware or software provider or cloud-based provider shall be governed solely pursuant to any agreement or other arrangement between Client and such provider.

5. **Termination.**

(a) Termination by Either Party. Either Client or Company may terminate this Agreement as follows:

(i) upon thirty (30) days written notice for any reason; or

(ii) upon default by the other party in the performance of any material term or provision, and such default continues for a period of fifteen (15) days after the defaulting party receives written notice from the other party specifying the default and the default is not cured to the reasonable satisfaction of the non-defaulting party within such fifteen (15) day period; provided, however, the defaulting party shall have up to an additional fifteen (15) days to cure such default if the defaulting party has commenced the cure of the default and such default is not capable of being cured within the initial fifteen (15) day period.

(b) Immediate Termination by Company. Subject to Section 5(b)(iv) below, Company, in its sole discretion, may immediately terminate the Agreement for "Cause." For purposes of this Section, "Cause", with respect to termination by Company, means:

(i) conviction, entry of a plea of no contest or its equivalent, or the withholding of adjudication to any allegation of a criminal violation of law that constitutes a felony under federal or state law, or any crime that involves fraud, dishonesty, patient abuse and/or moral turpitude of Client or any laboratory personnel of Client;

(ii) Client's, or any laboratory personnel of Client's (by reason of employment or otherwise), exclusion, suspension or termination from participation in any federal health care program including, but not limited to, Medicare or Medicaid, for any period of time; or

(iii) With respect to subsections (i) and (ii), as they relate to any laboratory personnel, in the event Client terminates the employment of, or other retention relationship with such person, as well as any ownership interest related to said relationship, if any, within fifteen (15) days following the date on which such event occurred, Client will be deemed to have cured such Cause.

(c) No Further Obligation. Except as specifically provided herein, upon the termination or expiration of this Agreement, neither party will owe any duty or have any obligation to the other party; provided, however, Client shall pay Company the Compensation set forth on **Exhibit A** for a period of one hundred twenty (120) days following any such termination ("Post Termination Period") for those Aged A/R undertaken by Company prior to the termination or expiration of this Agreement collected by Client or Company during the Post Termination Period ("Post Termination Compensation"). During the Post Termination Period, Company shall work to collect Client's Aged A/R for those accounts for which Company rendered Services during the Term of this Agreement. During the Post Termination Period, Company shall have the right to review the books and records of Client to determine the sums due to Company from payments on Aged A/R collected by Client, and Client shall have the obligation to report its Aged A/R Collections to Company, in accordance with Section 4 hereof. Notwithstanding the foregoing, upon Client's failure to pay any Compensation when due, Company shall have no further obligation to actively work on the collection of Client's accounts receivable as set forth above, but shall retain the other rights set forth in this Agreement, including, without limitation, the right to receive all Compensation (Post Termination Compensation or otherwise) due Company. During the Post Termination Period, Client shall pay Company any Post Termination Compensation remaining

due. During the Post Termination Period, if the Services include billing services, Client shall provide Company with access to the Client's billing system. While the Bankruptcy Case is pending, the Bankruptcy Court shall have the exclusive jurisdiction to resolve any and all disputes among the Client and Company arising from any outstanding Post-Termination Compensation claimed due.

6. **Compensation**. In consideration of the Services provided under this Agreement, Client agrees to pay to Company compensation as set forth on **Exhibit A** (the "Compensation"). The Compensation shall be paid by Client from on or before the tenth (10th) day following receipt of the monthly invoice for the month in which Company provided the Services. Company shall submit its monthly invoice for its Compensation for any month no later than the fifteenth (15th) day of the immediately following month, such invoice to provide reasonable detail for the determination of the Compensation for such month. Alternatively, Client may authorize Company to electronically collect all amounts owed under this Agreement via a monthly automated clearing house ("ACH") transfer from Client's account or similar automatic payment process. Client shall provide Company with written notice of any change in the Client account information, within three (3) business days of the date of the change. Client's financial institution is solely responsible for properly applying all credits and debits to the Client account. Compensation not received within such ten (10) day period shall be deemed delinquent and shall accrue interest at the greater of 1.5% per month or the highest rate permitted under Georgia law.

7. **Books and Records**.

(a) Medical Records. Upon the expiration of the Post Termination Period, Company will not be entitled to retain a partial or complete original or copy, in any form or format, of a medical record, case history and/or chart of any patient treated by Client which Company had access to in connection with the provision of Services hereunder. Notwithstanding the foregoing, after termination of the Agreement, upon reasonable request, Client shall provide Company access to true and complete copies of Client records including, but not limited to, medical records, charts, histories, patient financial records, and any other information in Client's possession for the purpose of enabling Company to respond to (i) any third party complaint, law suit or allegation concerning its and/or a staff member's alleged misconduct; or (ii) any inquiry, investigation, or complaint by any governmental agency, private insurer, managed care organization or other third party payor.

(b) Survival. This Section 7 will survive the expiration or termination of this Agreement.

8. **Compliance with Laws.** Each party agrees to fulfill their obligations under this Agreement in compliance with all applicable state, federal and local law now or hereafter in existence. The parties agree that in the event that legislation is enacted or a regulation is promulgated or a judicial or administrative decision is rendered that affects, or may affect, the legality of this Agreement or adversely affect the ability of either party to perform its obligations or receive the benefits intended hereunder, then, within twenty (20) days following notice by either party of such event, each party will negotiate in good faith a substitute agreement to this Agreement which will carry out the original intention of the parties to the extent possible in light of such legislation, regulation or decision.

9. **HIPAA**. Company and Client agree to comply with the terms and conditions of the Business Associate Agreement incorporated herein and attached hereto as **Exhibit C**.

10. **Confidential Information and Company Staff.**

(a) Business Interest. Client agrees that Company has a legitimate business interest in protecting its Confidential Information and Trade Secrets and in protecting its investment in its staff and agrees that this Section contains reasonable agreements and covenants with respect to same. Client acknowledges that Company would not enter into this Agreement but for Client's agreement to the terms of this Section.

(b) Confidentiality Agreement. Client acknowledges that Client shall have access to or may become acquainted with "Confidential Information" (as hereinafter defined) and "Trade Secrets" (as hereinafter defined) of Company. In recognition of Company's significant investment of time, effort and money in developing and preserving its Confidential Information and Trade Secrets, Client agrees to hold in confidence during the Term hereof and for a period of ten (10) years after the termination or expiration of this Agreement for any reason whatsoever (the "Nondisclosure Period") as the sole property of Company, all Confidential Information and Trade Secrets. During the Nondisclosure Period, Client covenants and agrees that it will treat as confidential and will not use or disclose any Confidential Information or Trade Secrets to any person, firm, corporation or other entity, without the prior written consent of Company (except as required by law), which may be withheld in Company's sole and absolute discretion. Client also agrees that it will diligently protect all Confidential Information and Trade Secrets against inadvertent or unauthorized disclosure and will comply with any rules or regulations established by Company for the purpose of protecting such information.

During the Nondisclosure Period, Client agrees to hold the Confidential Information (as defined in subsection (c) below) in the strictest confidence and not to disclose or publish the Confidential Information to any person or entity except: (i) to Client's professional advisors, if any, and (ii) upon duly issued subpoena or court order; and in such event, Client shall notify Company so that Company may seek a protective order limiting the use and disclosure of the Confidential Information as strictly as possible.

(c) Confidential Information-Defined. For purposes of this Agreement "Confidential Information" shall include, without limitation, all records, files, reports, protocols, policies, procedures, manuals, databases, processes, computer systems, custom computer software and related materials, trade name interests, copyright interests, service mark interests, logos, other intellectual property interests, pricing discounts, cost structures, volume, distribution and deployment services, insurance, buying and service contracts, physician and clinic information, supplier and distributor information, licenses, authorizations, certifications, other contracts and other information (or drafts thereof), in whatever form or format, pertaining to the business or operations of Company which has value to Company and is not generally known to its competitors; however, Confidential Information shall not include any information that (i) at the time of disclosure is, or thereafter becomes, generally available to and known by the public, (ii) at the time of disclosure is, or thereafter becomes, available on a non-confidential basis from a source other than Company, or (iii) is independently acquired or developed without violating any of its obligations under this Agreement.

(d) Trade Secrets - Defined. For purposes of this Agreement "Trade Secrets" shall mean information, in whatever form or format, including, but not limited to, any formula, pattern, compilation, program, device, method, technique, or process that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can or may obtain economic value from its

disclosure or use; and (b) is the subject of efforts that are reasonable, under the circumstances, to maintain its secrecy.

(e) Company Staff. Client acknowledges that Company has invested significant time and other resources in the initial and subsequent training of its staff. Client also acknowledges that Company's staff, due to their positions of trust, have had access to Trade Secrets and Confidential Information of Company. Therefore, in order to protect Company's legitimate business interests and assets, during the Term of this Agreement and for a period of twenty-four (24) months following its expiration or termination for any reason whatsoever ("Non-Solicitation Period"), Client shall not: (i) employ, hire, or otherwise retain, or (ii) recruit, solicit or otherwise attempt to retain, either on its own behalf or on behalf of any third party any person who was Company's staff and with whom Client had contact at any time during the Term of this Agreement.

11. **Miscellaneous.**

(a) Dispute Resolution. While the Bankruptcy Case is pending, the Bankruptcy Court shall have exclusive jurisdiction to resolve any and all disputes among the Client and Company arising from this Agreement. After the conclusion of the Bankruptcy Case, the following dispute resolutions shall apply:

(i) Mediation. Except for actions for temporary, preliminary or permanent injunctive relief or unless specifically provided in this Agreement, as a precondition to the commencement of litigation, the parties agree that any controversy or claim arising out of or relating to the interpretation, enforcement or breach of this Agreement or the relationship between the parties hereto shall be submitted to non-binding mediation and the parties agree to use a good faith effort to resolve any such dispute. Mediation shall be by a single mediator, experienced in the matters at issue, and mutually agreed upon by the parties. In the event that the parties cannot agree on a single mediator, each party shall select a mediator who shall be charged with selecting a third mediator and the third mediator so appointed will conduct the mediation conference. The mediation shall be held in Fulton County, Georgia at such place as may be specified by the mediator (or any place agreed to by the parties and the mediator). Each party shall bear their own costs and expenses incurred in connection with any such mediation.

(ii) Arbitration. In the event mediation fails, then the Parties agree to submit such dispute to binding arbitration in the city of Lawrenceville, Georgia pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Any arbitration compelled under the terms of this provision shall be conducted in Gwinnett County, Georgia. Notwithstanding, the foregoing requirement to arbitration shall not prevent either party from seeking injunctive relief to the extent permitted by law.

(b) Indemnification. Client shall forever indemnify and hold Company and its members, officers, employees, independent contractors and agents harmless from and against any and all claims, damage, injury, liabilities, costs and expenses, including, without limitation, fees and disbursements of counsel incurred by Company, its members, officers, employees, independent contractors and/or agents arising out of or in any way related to: (a) any breach of this Agreement by Client and/or any of its employees' negligent or criminal acts; and/or (b) any liability arising under any managed care contract, insurance contract, Medicare or Medicaid program or other third party payor contract relative to billings submitted by Company based on the information provided by Client or its employees to Company. Upon notice from the Company,

the Client will resist and defend, at its expense, any such claim or action, provided that each party shall have the right to participate in the defense.

Company shall forever indemnify and hold Client and its members, officers, employees, independent contractors and agents harmless from and against any and all claims, damage, injury, liabilities, costs and expenses, including, without limitation, fees and disbursements of counsel incurred by Client, its members, officers, employees, independent contractors and/or agents arising out of or in any way related to any breach of this Agreement by Company and/or any of its negligent or criminal acts. Upon notice from the Company, Client will resist and defend, at tis expense, any such claim or action, provided that each party shall have the right to participate in the defense.

(c) Referral Disclaimer. Compensation paid by Client hereunder has been determined by the parties through good faith and arms-length bargaining to be the fair market value for the Services. The fees have not been determined in any manner that takes into account the volume or value of any potential referrals between the parties or their affiliates. No amount paid hereunder is intended to be nor shall it be construed to be, an inducement or payment for referral of patients or other business generated between the parties or their affiliates. In addition, the amount charged hereunder does not include any discount, rebate, kickback or a reduction in charge and the amount charged is not intended to be, nor shall it be construed to be, an inducement or payment for referral of patients by either party or its affiliates.

(d) Independent Judgment. Nothing in this Agreement will interfere, or impede with, Client's exercising of its independent judgment in providing clinical laboratory services.

(e) Entire Agreement. This Agreement and the exhibits attached hereto contain the entire agreement between the parties and supersedes all prior negotiations or agreements, whether written or oral, between them with respect to the matters set forth herein. If there is any inconsistency between this Agreement and an Exhibit, the terms of the Exhibit shall be applicable.

(f) Severability. If a court having jurisdiction over this Agreement shall determine that any provision in this Agreement is overbroad or is unenforceable for any reason, it is the intention of parties that this Agreement shall be amended to the extent required by such court to render it valid and enforceable to the greatest extent permissible by such court and the applicable law and public policy.

(g) Binding Effect. This Agreement is binding upon and will inure to the benefit of the parties, their heirs, personal representatives, successors and assigns.

(h) Additional Documents. Both parties hereto agree to execute in an expeditious manner all instruments in writing and to do all other things necessary to effectuate the purpose of this Agreement.

(i) Governing Law and Venue. This Agreement will be construed and enforced in accordance with the laws of the State of Georgia, and the venue for any litigation arising hereunder shall be exclusively in Fulton County, Georgia and the federal court whose jurisdiction includes Fulton County, Georgia; provided, however, while the Bankruptcy Case is pending, the Bankruptcy Court shall have the exclusive jurisdiction to resolve any and all disputes among the Client and Company arising from this Agreement. With respect to any violations of Section 10,

the parties agree that damages at law may be an inadequate remedy. Therefore, in addition to any other remedies available to a party at law, each party shall be entitled to preliminary and permanent injunctive relief to prevent a breach by of Section 10, without prejudice to any other right or remedy, legal or equitable, to which such party may be entitled and the defaulting party agrees that no bond or other security shall be required to obtain such injunctive relief. In addition, during the pendency of any legal or equitable action, such time shall not be included in calculating any restrictive period.

(j) Assignability. Company may freely assign this Agreement and any of its rights or delegate any of its duties hereunder without the prior written consent of ClientCompany may delegate the performance of the Services and obligations hereunder to third party vendors in its sole discretion.

(k) Section Headings. The section headings contained in this Agreement are for convenience of reference only and will not be used for substantive purposes.

(l) [Omitted]

(m) Severability. Should any part of this Agreement be declared invalid or unenforceable for any reason, such decision shall not affect the validity of the remainder of this Agreement, which will remain in full force and effect and enforceable in accordance with its terms.

(n) Waiver of Breach. The waiver by either party of a breach or violation of any provision hereunder will not constitute a waiver of any prior simultaneous, or subsequent breach of the same or any other provision hereof.

(o) Gender and Number. Whenever the context requires, the gender of all words will include the masculine, feminine, and neuter, and the number of words will include the singular and the plural.

(p) Notices. Unless otherwise provided herein, all notices, offers, acceptances and other communications required or permitted hereunder will be in writing and will be delivered (i) in person, (ii) by means of registered or certified mail, return receipt requested, postage prepaid, or (iii) by any nationally utilized overnight delivery service. All such notices will be deemed given (i) immediately, if delivered by hand, (ii) on the third day (except Saturdays, Sundays and national holidays) after delivery into the custody of the United States Postal Service if mailed as aforesaid, or (iii) on the first day (except Saturdays, Sundays and national holidays) after delivery if sent by overnight delivery service. Notices will be sent:

If to Company: NYX HEALTH RECOVERY SERVICES, LLC
8440 Holcomb Bridge Road, Suite 560
Alpharetta, GA 30022
Attn: Gregory Wachowiak

If to Client: CONFIRMATRIX LABORATORY, INC.
1770 Cedars Rd., Suite 200
Lawrenceville, GA 30045
Attn: Ann Durham

With a Copy to: James-Bates-Brannan-Groover-LLP
3399 Peachtree Rd NE, Suite 1700
Atlanta, GA 30326
Attention: J. William Boone, Esq.

Either party may change the address to which such notice or other communication may be sent by giving written notice to the other party hereto of such new address.

(q) Amendment. This Agreement may be amended only in writing signed by both parties.

(r) Counterparts. This Agreement may be executed in counterparts, including via facsimile of a PDF file containing a copy of the signature of a party hereto, each of which shall be considered an original, and all of which together shall constitute one (1) instrument.

(s) Nature of Relationship. The nature of the parties' relationship under this Agreement will be that of an independent contractor. Nothing herein will be interpreted or applied to create a partnership, joint venture, principal and agent, employment or other relationship between Company and Client.

(t) No Breach. Company and Client each warrant and represent to the other that entering into this Agreement will not cause that party to breach any contract, agreement, understanding or other commitment to which it is a party, third party beneficiary or third party obligor.

(u) Construction. Nothing in this Agreement will be construed against one party as the drafter, proponent, or maker thereof. This Agreement will be construed with an irrefutable presumption that all of its terms were negotiated between and drafted by both Client and Company.

(v) Force Majeure. Except for the payment of Compensation owed hereunder, either party's failure to perform under the terms of this Agreement will be excused because of any delay or prevention, directly or indirectly, caused by any condition beyond its control including without limitation, the following: fires; floods; earthquakes; hurricanes; disasters; other acts of God; accidents; riots; wars; operation of law; strikes; governmental action or regulation; shortage of labor, fuel, power, materials, supplies or transportation; or supplier delay.

*[SIGNATURE PAGE TO FOLLOW]*

**IN WITNESS WHEREOF,** the parties hereunto have executed this Billing Services Agreement on the day and year first above written.

**COMPANY:**

**NYX HEALTH RECOVERY SERVICES, LLC,**
a Georgia limited liability company

By: greg wachowiak
Gregory Wachowiak, President

**CLIENT:**

**CONFIRMATRIX LABORATORY, INC.**

By:
Ann Durham
Chief Executive Officer

# Exhibit A

## Compensation

As payment for the Services provided by Company for or on behalf of Client, Client shall pay Company twenty percent (20%) of any and all Aged A/R Collections (as hereafter defined) received by Client. For purposes of this section, "Aged A/R Collections" means the gross amount of payments received by Client due to Company's Services, including, without limitation, payments by insurance companies or other third party payors and self-paying patients for the collection of the Aged A/R. Compensation owed to Company shall be payable in accordance with Section 6 of the Agreement.

# Exhibit B

## Confidentiality and Non-Disclosure Agreement

# CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

**THIS CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT** (this "Agreement") is made on this 2nd day of December, 2016 (the "Effective Date") by and between **NYX HEALTH RECOVERY SERVICES, LLC**, a Georgia limited liability company, and **CONFIRMATRIX LABORATORY, INC.**, a Georgia limited liability company (each, a "party" and, collectively, the "parties").

## WITNESSETH:

**WHEREAS,** in connection with a possible billing services agreement between the parties (the "Billing Engagement"), each party ("Disclosing Party") may disclose certain oral and written information concerning the Billing Engagement and Disclosing Party's business to the other party ("Receiving Party"). In order to explore this possibility, Disclosing Party has agreed to disclose to Receiving Party certain confidential and proprietary information owned by Disclosing Party, including, without limitation, Disclosing Party's business model and certain intellectual property. The parties have agreed that the exchange of such information shall be governed by the terms and conditions of this Agreement; and

**WHEREAS**, Client has filed a petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* with the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court"), Case No. 16-69934-PWB (the " Bankruptcy Case"); and

**WHEREAS**, Client and Company acknowledge and agree that this Agreement and the transactions contemplated herein must be approved by entry of an order of the Bankruptcy Court.

**NOW, THEREFORE,** in consideration of the mutual promises, covenants and conditions hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. The above recitals are true and correct and incorporated herein. Each of the parties agrees and acknowledges that each respective party is fully bound by the statements contained in the recitals.

2. As a condition to the Receiving Party being furnished such information, Receiving Party agrees to treat any information concerning Disclosing Party (whether prepared by Disclosing Party, its advisors or otherwise) which is furnished to it by or on behalf of Disclosing Party (herein collectively referred to as the "Confidential Information") in accordance with the provisions of this Agreement and to take or abstain from taking certain other actions herein set forth. The term "Confidential Information" as used herein shall mean all information which is devised, disclosed, or made available by Disclosing Party to Receiving Party, including, but not limited to, the existence of discussions between Disclosing Party and Receiving Party and the subject matter thereof;

prospective and actual patient names, contacts, addresses; patient records and charts; business techniques, policies, methods and procedures related to a party's business, pricing and marketing; fee schedules and reimbursement or compensation arrangements with patients, insurance companies and other payors; inventory and inventory lists; supplies, suppliers' names and addresses, and supplier and supply lists; contracts, policies, reports, histories, comparisons and information; advertising, advertising copy and programs; business reports, financial statements and reports, and operating statements; investors, owners, employees, agents, subagents and independent contractor names, addresses, lists, compensation and benefits, productivity and information; computer programs, computer software, databases and data; and know-how, discoveries, inventions, writings, conceptions, knowledge, information, plans, programs and tangible expressions of ideas; and such other information as may be designated as such by Disclosing Party. The term "Confidential Information" does not include information which (i) is already in Receiving Party's possession, provided that such information is not known by Receiving Party to be subject to another confidentiality agreement with, or other obligation of secrecy to, Disclosing Party; (ii) becomes generally available to the public other than as a result of disclosure by Receiving Party or its advisors, or (iii) becomes available to Receiving Party on a non-confidential basis from a source other than the Disclosing Party or its advisors, provided that such source is not known by Receiving Party to be bound by a confidentiality agreement with, or other obligation of secrecy to, Disclosing Party.

3. Receiving Party hereby agrees that the Confidential Information will be used solely for the purpose of evaluating a possible Billing Engagement between the Disclosing Party and Receiving Party, and that such information will be kept confidential by Receiving Party and its advisors; provided, however, that: (i) any of such information may be disclosed to Receiving Party's directors, officers, and employees and representatives of its advisors who need to know such information for the purpose of evaluating any such possible Billing Engagement between the Disclosing Party and Receiving Party (it being understood that such directors, officers, employees, and representatives shall be informed by Receiving Party of the confidential nature of such information and shall be directed by Receiving Party to treat such information confidentially); and (ii) any disclosure of such information may be made to which the Disclosing Party consents in advance in writing.

4. Receiving Party understands and acknowledges that it is responsible for ensuring compliance with the restrictions and obligations of this Agreement by its advisors, directors, officers, employees, and representatives of its advisors, and is responsible for any breach or violation of the restrictions and obligations of this Agreement by any such advisor, director, officer, employee, or representative of its advisor.

5. In the event that Receiving Party receives a request to disclose all or any part of the information contained in the Confidential Information under the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction or by a governmental body, Receiving Party agrees to: (i) immediately notify the Disclosing Party of the existence, terms and circumstances surrounding such a request; (ii) consult

with the Disclosing Party on the advisability of taking legally available steps to resist or narrow such request; and (iii) if disclosure of such information is required, exercise its best efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the disclosed information which the Disclosing Party so designates.

6. Each party agrees that unless and until definitive agreements relating to the Billing Engagement have been fully executed and delivered, it will not be under any legal obligation of any kind whatsoever with respect to the Billing Engagement by virtue of this Agreement or any written or oral expression with respect to the Billing Engagement by any party's representatives except, in the case of this Agreement, for the matters specifically agreed to herein.

7. Receiving Party shall (i) return to Disclosing Party all Confidential Information, together with any and all copies thereof, within ten (10) days of written request therefor; (ii) destroy all copies of any analyses, compilations, studies or other information prepared by or for its internal use which reflects the Confidential Information; and (iii) certify in writing to the Disclosing Party that all such documents, materials and information have been so returned or destroyed. Either party may terminate this Agreement at any time for any reason or no reason whatsoever by delivering written notice thereof to the other party. The termination of this Agreement for any reason or no reason whatsoever shall not discharge or release any party from any liability or obligation that shall have previously accrued and remains to be performed under this Agreement on or after the effective date of termination of this Agreement.

8. Receiving Party agrees that Disclosing Party may be entitled to injunctive relief from any court of competent jurisdiction, such relief to be available without the necessity of posting a bond, cash or otherwise.

9. The parties shall enter into a Business Associate Agreement in the form attached hereto as **Exhibit C**.

10. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of the Agreement and the application of such provision to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law. No failure or delay in exercising any right hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. This Agreement may be modified only by separate writing signed by all the parties hereto. This Agreement shall be binding on the parties as well as their respective parents, subsidiaries, affiliated entities, successors and assigns.

11. This Agreement will be construed and enforced in accordance with the laws of the State of Georgia, and the venue for any litigation arising hereunder shall be exclusively in Fulton County, Georgia and the federal court whose jurisdiction includes Fulton County, Georgia; provided, however, while the Bankruptcy Case is pending, the

Bankruptcy Court shall have the exclusive jurisdiction to resolve any and all disputes among the Client and Company arising from this Agreement.

12. This Agreement may be signed in any number of counterparts, including facsimile and .pdf copies, and as executed will constitute one and the same Agreement.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**NYX HEALTH RECOVERY SERVICES, LLC,**
a Georgia limited liability company

By: greg wachowiak (Dec 1, 2016)
Gregory Wachowiak, President

**CONFIRMATRIX LABORATORY, INC.**

By: ______________________
Ann Durham
Chief Executive Officer

# Exhibit C

## Business Associate Agreement

# BUSINESS ASSOCIATE AGREEMENT

**THIS BUSINESS ASSOCIATE AGREEMENT** (this "Agreement") is made and entered into as December 2nd, 2016 (the "Effective Date"), by **CONFIRMATRIX LABORATORY, INC.**, a Georgia limited liability company (the "Covered Entity"), and **NYX HEALTH RECOVERY SERVICES, LLC**, a Georgia limited liability company (the "Business Associate") (Business Associate and Covered Entity may be referred to hereinafter individually, as a "party" or collectively, as "parties").

**WHEREAS,** Covered Entity and Business Associate have entered into a Confidentiality and Non-Disclosure Agreement to evaluate a potential billing and collection services engagement (the "Engagement"), which will require the use or disclosure of Protected Health Information ("PHI"), as defined below. PHI as defined below, is information that is subject to protection under the privacy regulations ("Privacy Regulations") and security regulations ("Security Regulations") of the Health Insurance Portability and Accountability Act of 1996, and regulations promulgated thereunder ("HIPAA");

**WHEREAS,** Covered Entity requires that Business Associate protect the privacy and provide for the security of PHI in compliance with the Privacy Regulations and Security Regulations;

**WHEREAS,** the Privacy Regulations and Security Regulations require Business Associate to enter into an agreement containing specific requirements for use or disclosure of PHI; and

**WHEREAS,** the Business Associate acknowledges and agrees that Business Associate is also subject to the Health Information Technology for Economic and Clinical Health Act of 2009, and regulations promulgated thereunder ("HITECH Act"); and

**WHEREAS,** Client has filed a petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court"), Case No. 16-69934-PWB (the " Bankruptcy Case"); and

**WHEREAS,** Client and Company acknowledge and agree that this Agreement and the transactions contemplated herein must be approved by entry of an order of the Bankruptcy Court (the "Approval Order").

**NOW, THEREFORE,** in consideration of the foregoing and of the covenants and agreements set forth herein, the parties, intending to be legally bound, agree as follows:

1. **Recitals**. The parties agree that the foregoing recitals are true and correct and are hereby incorporated herein by this reference. Each of the parties agrees and acknowledges that each respective party is fully bound by the statements contained in the recitals.

2. **Definitions**. The terms used, but otherwise not defined, in this Agreement shall have the same meaning as those terms in the Privacy Regulations and Security Regulations at 45 CFR 160.103.

(a) "Electronic Media" shall mean storage media including memory devices in computers (hard drives) and any removable/transportable digital memory medium, such as magnetic tape or disk, optical disk, or digital memory card; or transmission media used to exchange information already in electronic storage media. Transmission media include, for example, the internet (wide-open), extranet (using internet technology to link a business with information accessible only to collaborating parties), leased lines, dial-up lines, private networks, and the physical movement of removable/transportable electronic storage media.

(b) "Electronic Protected Health Information" or "ePHI" shall mean PHI transmitted or maintained in Electronic Media.

(c) "Individual" shall have the meaning set forth in 45 C.F.R. § 160.103, including a person who is the subject of the Protected Health Information, and shall include an individual or entity who qualifies as a personal, legal representative of the person, as the context requires.

(d) "Privacy Regulations" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Parts 160 and 164, Subparts A and E, as may be amended, modified or superseded, from time to time.

(e) "Protected Health Information" or "PHI" shall have the meaning set forth in 45 C.F.R. § 160.103, including any information, whether oral or recorded in any form or medium: (i) that relates to the past, present or future physical or mental condition of an Individual; or (ii) the provision of health care to an Individual; or (iii) the past, present or future payment for the provision of health care to an Individual; and (iv) that identifies the Individual or with respect to which there is a reasonable basis to believe the information can be used to identify the Individual.

(f) "Regulatory References" shall refer to the section as in effect or as amended.

(g) "Required By Law" shall have the same meaning as the term "required by law" in 45 C.F.R. § 164.103.

(h) "Secretary" shall mean the Secretary of the U.S. Department of Health and Human Services or his/her designee.

(i) "Security Measures" shall have the meaning set forth at 45 C.F.R. § 164.304.

(j) "Security Regulations" shall mean the Standards for Security of Individually Identifiable Electronic Health Information at 45 C.F.R. Parts 160 and 164, Subparts A, C and E, as may be amended, modified or superseded, from time to time.

(k) "Subcontractor" shall mean a person or entity to which Business Associate delegates a function, activity or service in a capacity other than as a member of the workforce of Business Associate.

(l) "Unsecured PHI" means PHI that has not been rendered unusable, unreadable, or indecipherable to unauthorized persons or entities through the use of a technology or methodology specified by the Secretary in the guidance given under Section 13402(h)(2) of the HITECH Act, and available at *www.hhs.gov*, which may be amended from time to time.

3. **Obligations of Business Associate.**

(a) Permitted Uses; Obligations. Business Associate shall not use PHI except for the purpose of performing Business Associate's obligations solely in accordance with the Engagement or as Required by Law, and shall not use PHI in any manner that would constitute a violation of 45 C.F.R. Parts 160 and 164 if so used by Covered Entity. To the extent that Business Associate takes on certain of the Covered Entity's obligations under the Privacy Rule, Business Associate shall perform such obligations in the same manner that Business Associate would if Business Associate was a covered entity subject to the Privacy Rule. Business Associate shall have no right whatsoever to use health information made available to Business Associate by Covered Entity, including PHI which has been de-identified as set forth in 45 C.F.R. § 164.514, for any purpose other than to accomplish the specific objectives of the Engagement among the parties.

(b) Permitted Disclosures. Business Associate shall not disclose PHI except for the purpose of performing Business Associate's obligations solely in accordance with the Engagement between the parties and shall not disclose PHI in any manner that would constitute a violation of 45 C.F.R. Parts 160 and 164 if so disclosed by Covered Entity. To the extent that Business Associate discloses PHI to a third party, Business Associate must obtain, prior to making any such disclosure: (i) reasonable assurance from the third party that such PHI will be held in a confidential manner; (ii) reasonable assurance from the third party that such PHI will be used or further disclosed only as required by law or for the purpose for which it was disclosed to such third party; and (iii) an agreement from the third party to immediately notify Business Associate of any breaches of confidentiality of such PHI, to the extent the third party has obtained knowledge of such breach.

(c) Appropriate Safeguards. Business Associate shall implement appropriate administrative, technical and physical Safety Measures in compliance with the Privacy Regulations as are necessary to prevent the use or disclosure of PHI and/or ePHI, other than as permitted by this Agreement. Business Associate further acknowledges and agrees that, pursuant to 42 U.S.C. § 17931(a), Business Associate will implement and document Business Associate's Security Measures in accordance with 45 C.F.R. §§ 164.308, 164.310, 164.312, and 164.316 in the same manner Business Associate would if Business Associate was a covered entity subject to the aforementioned regulations.

(d) Business Associate's Agents and Subcontractors. To the extent Business Associate uses one or more subcontractors or agents to provide services to Covered Entity pursuant to the Engagement between the parties, and such subcontractors or agents receive or have access to PHI, Business Associate shall require that any subcontractor or agent that creates, receives, maintains, or transmits PHI and/or ePHI on behalf of Business Associate, enter into and adhere to HIPAA compliant agreements, in accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2). Business Associate shall implement and maintain sanctions against subcontractors and agents that violate such restrictions and conditions and shall mitigate the effects of any such violation.

(e) Access to PHI. Within five (5) days of receipt of a request from Covered Entity, Business Associate shall make PHI available to Covered Entity for inspection and copying to enable Covered Entity to fulfill Covered Entity's obligations under 45 C.F.R. § 164.524. Further, Business Associate shall provide access to PHI as directed by Covered Entity, to an Individual in order to satisfy requirements under 45 C.F.R. § 164.524.

(f) Amendment of PHI. Within five (5) days of receipt of a request from Covered Entity, Business Associate shall amend PHI as directed by Covered Entity to enable Covered Entity to fulfill Covered Entity's obligations under 45 C.F.R. § 164.526. If a request for amendment of PHI is delivered directly to Business Associate, Business Associate shall, as soon as possible, but no later than five (5) days after receipt of the request, forward the request to Covered Entity.

(g) Accounting of Disclosures. Business Associate agrees to document disclosures of PHI and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 C.F.R. § 164.528. Within five (5) days of receipt or a request from Covered Entity, Business Associate shall make available to Covered Entity the information required to provide an accounting of such disclosures. Business Associate agrees to implement a process that allows for an accounting to be collected and maintained by Business Associate and his/her/its agents or subcontractors for at least six (6) years prior to the request (except for disclosures occurring prior to the Effective Date). At a minimum, such accounting information shall include the information described in 45 C.F.R. § 164.528(b), including, without limitation: (i) the date of disclosure of PHI; (ii) the name of the entity or person who received PHI and, if known, the address of the entity or person; (iii) a brief description of PHI disclosed; and (iv) a brief statement of purpose of the disclosure that reasonably informs the Individual of the basis for the disclosure, or a copy of the written request for disclosure. If a request for an accounting is delivered directly to Business Associate, Business Associate shall as soon as possible, but no later than five (5) days after receipt of the request, forward the request to Covered Entity.

(h) Governmental Access to Records. Business Associate shall make his/her/its internal practices, books and records relating to the use and disclosure of PHI, available to the Secretary in a time and manner designated by Covered Entity or the Secretary, for purpose of the Secretary determining Covered Entity's compliance with the Privacy

Regulations. Business Associate shall provide Covered Entity access to or a copy of any PHI or other information that Business Associate makes available to the Secretary.

(i) Minimum Necessary Use and Disclosure Requirement. Business Associate shall utilize the equivalent of a limited data set to the extent possible and/or feasible, and, if not possible and/or feasible, only request, use and disclose the minimum amount of PHI necessary to reasonably accomplish the purpose of the request, use or disclosure in accordance with 45 C.F.R. § 164.502(b). Further, Business Associate will restrict access to PHI to those employees of Business Associate or other workforce members under the control of Business Associate who are actively and directly participating in providing goods and/or services under the Agreement of the parties and who need to know such information in order to fulfill such responsibilities.

(j) Notification of Breach. During the term of this Agreement, Business Associate shall notify Covered Entity within twenty-four (24) hours of any actual or suspected use and/or disclosure of PHI in violation of the Privacy Regulations or this Agreement in accordance with 45 CFR 164.410. Business Associate shall take prompt corrective action to mitigate and cure any harmful effect that is known to Business Associate of an improper use and/or disclosure of PHI.

(k) Notification of Breach of Unsecured PHI. In addition to the notification set forth in Section 3(j), Business Associate agrees to report to Covered Entity any breach of Unsecured PHI as provided herein. Notification by Business Associate to Covered Entity must be made in writing, as soon as possible, but not more than fifteen (15) calendar days from the discovery of a breach by Business Associate. For purposes hereof, the term "discovery of a breach" shall mean that Business Associate, or an employee, officer, director, or agent of Business Associate, has acquired actual knowledge of a breach, or through the exercise of reasonable diligence and inquiry, should have acquired knowledge of a breach. The notification to the Covered Entity shall include, to the extent possible, the following information:

(i) a brief description of what happened, including the date of the breach and the date of the discovery of the breach, if known;

(ii) a description of the types of Unsecured PHI that were involved in the breach (*i.e.*, full name, social security number, date of birth, home address, account number, diagnosis, disability code, and other types of PHI);

(iii) any steps Individuals should take to protect themselves from potential harm resulting from the breach;

(iv) a brief description of what the Business Associate is doing to investigate the breach, to mitigate harm to Individuals, and to protect against any further breaches;

(v) contact procedures for Individuals to ask questions or learn additional information, which will include a toll-free telephone number, an email address, website, or postal address; and

(vi) any other information reasonably requested by Business Associate in order to comply with 45 C.F.R. § 164.400 et seq.

In addition to any indemnification pursuant to Section 7, below, Business Associate shall, upon thirty (30) days' written notice, pay all costs of investigation, mitigation and reporting that may be incurred by Covered Entity upon Business Associates' breach of Unsecured PHI.

Notwithstanding the foregoing, as between Covered Entity and Business Associate, the Covered Entity shall have final authority to determine whether a breach of Unsecured PHI has occurred, whether United States Health and Human Services notification requirements have been triggered, and the necessity for and content of any required notifications. Business Associate shall cooperate fully to assist Covered Entity in identifying individuals potentially affected by the breach, conducting the risk assessment required by the HITECH Act, and providing any required notifications. To the extent that the breach of Unsecured PHI resulted from acts or omissions of Business Associate and/or its subcontractors or agents, Business Associate shall be responsible for all costs reasonably incurred by Covered Entity and/or Business Associate as a result of such breach.

(l) HITECH Act. Business Associate and the Covered Entity each further agree that the provisions of HIPAA and HITECH Act that apply to Business Associates, and that are required to be incorporated by reference into a business associate agreement, are hereby incorporated into this Agreement between Business Associate and Covered Entity by this reference as if set forth herein in their entirety, and are effective as of the effective date of enforcement of any such requirements.

4. **Obligations of Covered Entity**.

(a) Limitations in the Notice of Privacy Practices. Covered Entity shall notify Business Associate of any limitation(s) in the notice of privacy practices of Covered Entity under 45 CFR 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of protected health information.

(b) Changes in Permission. Covered Entity shall notify Business Associate of any changes in, or revocation of, the permission by an individual to use or disclose his or her protected health information, to the extent that such changes may affect Business Associate's use or disclosure of protected health information.

(c) Notice of Restrictions. Covered Entity shall notify Business Associate of any restriction on the use or disclosure of protected health information that Covered Entity has agreed to or is required to abide by under 45 CFR 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of protected health information.

(d) Permissible Requests. Covered Entity shall not request Business Associate to use or disclose protected health information in any manner that would not be permissible under Subpart E of 45 CFR Part 164 if done by Covered Entity.

5. **Security of Electronic Protected Health Information.**

(a) Security. Business Associate will establish and maintain appropriate administrative, physical and technical Safety Measures that reasonably and appropriately protect the confidentiality, integrity and availability of ePHI, and prevent unauthorized use and disclosure. Business Associate will follow generally accepted system security principles and the requirements of the final HIPAA and HITECH Act rules pertaining to the security of health information.

(b) Agents and Subcontractors. Business Associate will ensure that any agent, including a subcontractor, to whom it provides ePHI agrees to implement appropriate administrative, physician and technical Safety Measures to protect such information.

(c) Security Incidents. Business Associate will within twenty-four (24) hours report any security incident of which it becomes aware to Covered Entity. This includes, but is not limited to attempted or successful unauthorized access, use, disclosure, modification or destruction of information or interference with system operations.

6. **Term and Termination.**

(a) Term. This Agreement shall commence on the Effective Date and will remain effective for the entire term of the Engagement between the parties, unless earlier terminated in accordance with the terms herein; provided, however, that certain of Business Associate's obligations may survive the termination of this Agreement as set forth in Section 6(d).

(b) Termination of Agreement. This Agreement will immediately terminate without notice upon termination of the Engagement.

(c) For Cause Termination Due to Material Breach. In the event of a material breach by Business Associate of any of his/her/its obligations hereunder, Covered Entity shall have the right, as specifically recognized by Business Associate, to terminate this Agreement and the Engagement between the parties, at any time by providing Business Associate written notice of termination setting forth a description of the breach and the effective date of termination.

(d) Effect of Termination. As of the effective date of termination of this Agreement, neither party shall have any further rights or obligations hereunder except: (a) as otherwise provided herein or in the Agreement between the parties; (b) for continuing rights and obligations accruing under the Privacy Regulations; or (c) arising as a result of any breach of this Agreement, including, but not limited to, any rights and remedies available at law or equity. Upon termination of this Agreement for any reason, Business Associate shall return or destroy all PHI (regardless of form or medium), including all copies thereof and any data compilations

derived from PHI and allowing identification of any Individual who is the subject of PHI. The obligation to return or destroy all PHI shall also apply to PHI that is in the possession of agents or subcontractors of Business Associate. If the return or destruction of PHI is not feasible, Business Associate shall provide Covered Entity written notification of the conditions that make return or destruction not feasible. Upon mutual agreement of the parties that return or destruction of PHI is not feasible, Business Associate shall continue to extend the protections of this Agreement to such information, and limit further uses or disclosures of such PHI to those purposes that make the return or destruction of such PHI not feasible, for as long as Business Associate maintains such PHI. If Business Associate elects to destroy the PHI, Business Associate shall notify Covered Entity in writing that such PHI has been destroyed.

7. **Indemnification**. Business Associate shall indemnify and hold Covered Entity, and its employees, officers, directors, independent contractors, agents and representatives, harmless from and against all claims, liabilities, judgments, fines, assessments, penalties, awards or other expenses, of any kind or nature whatsoever, including, without limitation, attorneys' fees, expert witness fees, and costs of investigation, litigation or dispute resolution, relating to or arising out of any breach of this Agreement by Business Associate or any action or inaction of any of Business Associate's subcontractors or agents. The obligations set forth in this Section 7 shall survive termination of this Agreement, regardless of the reasons for termination.

8. **Assignment**. This Agreement and the rights and obligations hereunder shall not be assigned, delegated, or otherwise transferred by the Business Associate without the prior written consent of the Covered Entity and any assignment or transfer without proper consent shall be null and void.

9. **Governing Law; Venue; Jurisdiction**. This Agreement shall be governed by and controlled by the laws of the State of Georgia. The parties agree that exclusive venue shall be in Fulton County, Georgia and the federal court whose jurisdiction includes Fulton County, Georgia; provided, however, while the Bankruptcy Case is pending, the Bankruptcy Court shall have the exclusive jurisdiction to resolve any and all disputes among the Client and Company arising from this Agreement. . The parties each hereby consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to them.

10. **Amendment or Modification**. This Agreement may only be amended or modified by mutual written agreement of the parties; provided, however, that in the event provisions of this Agreement shall conflict with the requirements of the Privacy Regulations, Security Regulations, or the HITECH Act, this Agreement shall automatically be deemed amended as necessary to comply with such legal requirements.

11. **Waiver**. The failure of either party at any time to enforce any right or remedy available hereunder with respect to any breach or failure shall not be construed to be a waiver of such right or remedy with respect to any other breach or failure by the other party.

12. **Severability**. In the event that any provision or part of this Agreement is found to be totally or partially invalid, illegal, or unenforceable, then the provision will be deemed to be

modified or restricted to the extent and in the manner necessary to make it valid, legal, or enforceable, or it will be excised without affecting any other provision of this Agreement, with the parties agreeing that the remaining provisions are to be deemed to be in full force and effect as if they had been executed by both parties subsequent to the expungement of the invalid provision.

13. **Entire Agreement**. This Agreement constitutes the entire agreement between the parties with respect to the matters contemplated herein and supersedes all previous and contemporaneous oral and written negotiations, commitments, and understandings relating thereto.

14. **Interpretation**. Any ambiguity in this Agreement shall be interpreted to permit compliance with the HIPAA Rules.

15. **Counterparts**. This Agreement may be executed in any number of counterparts, including facsimile or an e-mail of a PDF file containing a copy of the signature page of the person executing this document, each of which shall be an original, but all of which together shall constitute one in the same instrument.

**IN WITNESS WHEREOF,** Covered Entity and Business Associate have each caused this Agreement to be executed in their respective names by their duly authorized representatives, effective as of the Effective Date.

**COVERED ENTITY:**

**CONFIRMATRIX LABORATORY, INC.**, a Georgia limited liability company

By: ______________________________
Ann Durham, Chief Executive Officer

**BUSINESS ASSOCIATE:**

**NYX HEALTH RECOVERY SERVICES, LLC**, a Georgia limited liability company

By: greg wachowiak
Greg Wachowiak (Dec 1, 2016)
Gregory Wachowiak, President